

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FILED

JUN 1 8 2013

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

| | | |
|---|---|---|
| **KENNETH ROSSITER**<br><br>            **Plaintiff,**<br>   **v.**<br><br>**CITY OF PHILADELPHIA**<br><br>      **and**<br><br>**CHARLES H. RAMSEY**<br><br>          **Defendants.** | **13**<br><br>NO. _____ | **3429**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Kenneth Rossiter, through his undersigned counsel, hereby files this

Complaint against the above-captioned Defendants and alleges:

## INTRODUCTION

1.    Homicide Detective Kenneth Rossiter, a 30-year-veteran of the

Philadelphia Police Department, was unjustly fired without due process because he

worked too hard keeping us safe; he worked the "Last Out" shift from midnight to 8 a.m.

during which the bulk of homicides occur, often worked from home given the limited

resources at the Unit[1], frequently assisted *without pay* on cases not assigned to him[2],

---

[1]      The Philadelphia Police Department's investigation took numerous photographs of Det. Rossiter
carrying files into and out of his home. As the City conceded during the subsequent arbitration, the
Homicide Unit had filthy facilities and far too few computer workstations, and so numerous employees
went home to do their work.

[2]      Less than a month before the Philadelphia Police Department began its "investigation" into Det.
Rossiter's overtime, the desperate mother of a young woman who had been missing less than 48 hours
was told by another police officer that, while no homicide investigation could be opened yet, she should
speak with Det. Rossiter, who might be able to help. Det. Rossiter took her call, left the family barbeque
he was attending, and launched into his own investigation, using his experience, instinct, and guile to
extract from the suspect an indication as to where evidence could be found, eventually discovering blood

and was widely praised by victim's families for his thorough work and the time he spent
with them, both while on duty and while on investigation overtime.[3]

Det. Rossiter's tireless efforts and extraordinary level of overtime work for the City —
done with the approval and knowledge of his supervisors in the Homicide Unit, who
rightly believed the nature of the work demanded officers responsive to every little
rumor or suspicion of unsolved crime[4], officers with an infinite capacity for taking
pains[5] — made him a target.

2.      Det. Rossiter was fired without due process *not* because anyone with first-
hand evidence believed he was defrauding the City — the chief investigator from
Internal Affairs subsequently testified that he had no reason to doubt that Det. Rossiter
was indeed working every minute he claimed — but rather because Police Commissioner
Charles Ramsey was looking to generate favorable press and to punish the Fraternal
Order of Police for filing a labor grievance over the new Disciplinary Code.

3.      As Commissioner Ramsey told the *Daily News* the next day after firing
Det. Rossiter without due process, rather than simply re-scheduling the Police Board of
Inquiry hearing that had already been postponed: "I pulled the file after you called,
because I had not read it. After I read it, [dismissing him was] consistent with actions
I've taken in the past with allegations of overtime abuse. ..." Indeed, the capricious
termination was consistent with his practice in Philadelphia and his prior history in

---

in the cracks of the bedroom floorboards and, from that and other evidence in that room, a confession.
Det. Rossiter was not on duty and did not file for overtime.
[3]      The day after Det. Rossiter was reinstated, the mother of the murdered young woman texted him
a thank you note, saying that, without his hard work, they would have still been looking for her daughter.
[4]      Cf. *The Resident Patient*, by Arthur Conan Doyle: "He loved to lie in the very centre of five
millions of people, with his filaments stretching out and running through them, responsive to every little
rumor or suspicion of unsolved crime."
[5]      Cf. *A Study in Scarlet*, by Arthur Conan Doyle: "'They say that genius is an infinite capacity for
taking pains,' he remarked with a smile. 'It's a very bad definition, but it does apply to detective work.'"

2

Washington, D.C.: Commissioner Ramsey's practice is to utilize direct actions arbitrarily with negligible investigation[6] and a focus on short-term politics, leaving his erroneous terminations to be resolved by arbitrators later, with the vast majority of his direct actions being eventually reversed.

4.      Nearly a year later, an arbitrator ordered Det. Rossiter reinstated. The arbitrator found the City had no policy against officers performing work from home and had not proffered *any* evidence or testimony suggesting Det. Rosstier was not working when he said he was. He is back on the force, but little of the damage has been undone: thanks to the Defendants' defamatory statements to the press, Det. Rossiter is believed by some within the Department and outside the Department to be an overtime cheat, and by others to be a target of the Ramsey Administration, making them either unwilling or afraid to work with him. He has suffered and continues to suffer retaliation and aftereffects in his workplace, and a considerable loss to his earnings given his compromised ability to testify in court now — an injury that will persist even if he leaves the Department entirely and pursues work in private investigation.

5.      Det. Rossiter brings this lawsuit to vindicate his rights secured under the First and Fourteenth Amendments, and to enjoin the Defendants from continuing to violate other officer's rights through arbitrary Commissioner Direct Actions in lieu of the Police Board of Inquiry system.

## JURISDICTION

6.      This civil rights action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is based upon 28 U.S.C. § 1331 and 1343(a)(1), (3), and (4).

---

[6]      Cf. *A Scandal in Bohemia*, by Arthur Conan Doyle: "It is a capital mistake to theorize before one has data. Insensibly one begins to twist facts to suit theories, instead of theories to suit facts."

3

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)  because all of the defendants reside in the Eastern District of Pennsylvania and all of the relevant events occurred in this Court's venue.

### PARTIES

8.    Plaintiff Kenneth Rossiter (hereinafter referred to as "Plaintiff") is an adult individual who resides in Philadelphia County, Commonwealth of Pennsylvania.

9.    Plaintiff was employed as a police officer in the Philadelphia Police Department, and at all relevant times was covered by the terms of the Collective Bargaining Agreement between the City of Philadelphia and the Fraternal Order of Police ("FOP").

10.    Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania which owns, operates, manages, directs and controls the Philadelphia Police Department.

11.    Defendant, Charles H. Ramsey, was at all relevant times the Police Commissioner of the Philadelphia Police Department, the final decision maker as to the operation of the Philadelphia Police Department, and an employee of the City of Philadelphia. He was at all relevant times acting under color of state law.  Defendant Ramsey is responsible for establishing, maintaining, and enforcing the customs, practices, and policies of the Philadelphia Police Department.  He is being sued in both his individual and official capacities.

### SHORT AND PLAIN STATEMENT OF THE CLAIM

12.    Plaintiff has been a member of the Philadelphia Police Department for more than thirty years; since 2002, he has served as a Detective assigned to the

4

Homicide Unit. In the relevant time period, Plaintiff worked the "Last Out" overnight shift, midnight to 8:00 A.M. It is the busiest shift for the Homicide Unit.

13. As a member of the Philadelphia Police Department, Plaintiff has a cognizable property interest in his employment sufficient to trigger the procedural due process requirements of the Fourteenth Amendment. *Inter alia,* the Philadelphia Police Department is subject to collective bargaining pursuant to 43 P.S. §217.1 - 217.10. Municipal Police Officers under contract are not at-will employees and they cannot be terminated without a showing of just cause and a *Laudermill* hearing.

14. At all relevant times, a collective bargaining agreement ("CBO") was in force between the FOP and the City that prohibited the termination of a police officer without just cause.

15. In or about 2008, several local media sources published reports about alleged overtime abuse among City workers; the Philadelphia Police Department was the subject of particular public concern and scrutiny.

16. In January 2009, Defendants created an overtime-management unit in an effort to reduce the Department's expenses. Defendant Ramsey credited the unit with cutting approximately $17 million dollars in overtime pay during the past three years, including more than $5 million dollars in court-related overtime.

17. On August 12, 2010, the *Philadelphia Daily News* published a story on the highest-earners on the City payroll, noting that Defendant Ramsey was the 3rd highest paid employee ($195,000) while Plaintiff Rossiter earned the most overtime, for a total income of $163,923.

18. The Department claims that, on July 28, 2011, it received a complaint from an "anonymous retired neighbor" reporting that Plaintiff was "at home when he

5

was believed to be on overtime." The "anonymous retired neighbor" was never located. Plaintiff knows his neighbors well, and knows the poorly-written complaint — which included false claims about Plaintiff bragging about overtime and an absurd allegation that the neighbor could see into Plaintiff's bedroom and thus knew when Plaintiff was sleeping — would not have come from any of them.

19.    In response to the "anonymous complaint," Sergeant Joseph Nadolski, a member of Internal Affairs' Integrity Control Unit, began an investigation into Plaintiff's conduct, including surveillance conducted on twenty-three days during the period from August 8, 2011 to September 9, 2011.

20.    Plaintiff was observed at his home sixteen times when he was recorded for payroll purposes as being on either straight time or overtime. The Department's own investigators subsequently admitted that, given his overnight work schedule and his overall productivity, Plaintiff was likely, in fact, working, or preparing to testify in Court, both of which were permitted under the Homicide Unit's policies and practices.

21.    On December 13, 2011, without providing notice to Plaintiff, Sergeant Joseph Nadolski questioned Plaintiff concerning each instance that he was observed at home by the surveillance team. Plaintiff responded that, as permitted by Unit and Department policy, he had worked from home numerous times during that time period, and recounted the various reasons why he would have stopped at home. Plaintiff explained further that on any occasion he was observed at home for more than one hour, he was working on open cases which involved making phone calls, reviewing files, and using his home computer for research. As the City's own witnesses agreed at the arbitration, there were insufficient computers in the Unit to meet the need when detectives from one shift worked overtime during another shift.

6

22.     During the period covered by the surveillance, Plaintiff had been working on two investigations which were extremely complex and time-sensitive, and thus necessitated substantial amounts of investigative time.

23.     On or about December 27, 2011, Defendant Ramsey said in a statement to the *Philadelphia Daily News* that "[o]vertime is not a bad thing, there are things that go beyond your tour of duty" and that "[i]t's not the norm that people would falsify information," but that, "when serious [overtime] wrongdoing is uncovered," he would send the case "to the District Attorney's Office for review for possible criminal charges." He did not mention use of Commissioner's Direct Actions.

24.     On March 29, 2012, The Philadelphia Police Department charged Plaintiff with two counts of "Conduct Unbecoming," alleging that Plaintiff had violated Section 1-§010-10 of the Department's Disciplinary Code for making a false entry in any Department record and Section 1-§021-10 for conduct indicating employee has little or no regard for his responsibility as a member of the Department. A Police Board of Inquiry hearing was scheduled, postponed, then never scheduled again.

25.     On or about June 14, 2012, in a meeting with FOP labor representatives, Plaintiff was informed that Defendant Ramsey offered to give Plaintiff a mere reprimand in response to the charges against him, if the FOP were to withdraw their charge of Unfair Labor Practices in response to Defendant Ramsey's new Disciplinary Code. The FOP declined.

26.     On or about June 2012, Defendant Ramsey gave several statements, as Police Commissioner, to various media sources, falsely accusing Plaintiff of overtime abuse and indicating his intent to fire Plaintiff.  Defendant Ramsey expressed no concern that such termination would be without due process, and would be based on

7

allegations of falsifying hours that the Department's own investigators believed to be untrue.

27.    On or about June 17, 2012 Plaintiff responded publicly to the statements Defendant Ramsey made to the press. Plaintiff further responded, "Ask the mothers of Claire Clay, Terrence Hawkins, Malik Sims, Andrew Rivera and the Coleman family, ask them if I slept at home while I worked on their cases... Ask them if I was at home when I caught their killers."

28.    Plaintiff's statements to the press regarded a matter of public concern that had been widely publicized by the local media, and were protected by the First Amendment.

29.    On June 18, 2012, Plaintiff was told he would be terminated.

30.    On or about June 19, 2012, Defendant Ramsey accused Plaintiff of "overtime abuse" in a statement he made to the *Philadelphia Daily News*.

31.    Defendant Ramsey knew and intended that the contents of his false statements would be disseminated publicly. Defendant Ramsey's press statements and their contents were reported, and continue to be reported by essentially every major news organization in the Philadelphia region.

32.    Effective July 15, 2012, Defendant Ramsey terminated Plaintiff by "Commissioner's Direct Action," without affording Plaintiff a Police Board of Inquiry hearing, and without affording Plaintiff the most basic elements of due process.

33.    Defendants terminated Plaintiff pre-textually as part of their bargaining with the FOP and to gain favorability with the press, without regard to the falsity of the allegations against Plaintiff or to Plaintiff's right to due process.

8

34. Following Plaintiff's termination by "Commissioner's Direct Action", Plaintiff exercised a First Amendment Petition Clause protected activity by filing a grievance pursuant to the Collective Bargaining Agreement between the City and the FOP.

35. Pursuant to contractual internal grievance procedures, the FOP demanded arbitration. Arbitrator David J. Riley held three hearings.

36. Several witnesses, including Retired Homicide Detective David Baker and Homicide Detectives William Holmes and Joseph Bamberski, testified that, given the demanding nature of the work and the long hours required, Homicide Unit detectives, with the approval of their supervisors, stop home for brief periods during their regular and overtime hours for such reasons as having a meal, changing clothes, and grooming as necessary to prepare for testimony.

37. The Arbitrator concluded that it was an accepted practice for Homicide Detectives to leave the courthouse while signed in to court overtime in order to work their open cases whenever their presence is not immediately needed by the requesting Assistant District Attorney.

38. During the Arbitration hearing, the City's own witnesses, including Nadolski, stated that they had no reason to doubt Plaintiff's assertion that he was in fact working on his open cases when he was observed at home for extended periods of an hour or more.

39. On April 2, 2013, Arbitrator David J. Riley, upon consideration of the record, determined that the Defendants did not have just cause to terminate Plaintiff effective July 15, 2012 and ordered the City to promptly restore Plaintiff to his former

9

position within the Department as a detective in the Homicide Unit without loss of seniority.

40.     Thus, Plaintiff Rossiter was finally allowed to serve his City again, although the damage inflicted continues to reverberate in the form of economic losses, lost employment opportunities, and considerable mental anguish and distress, along with embarrassment and humiliation.

41.     Moreover, since returning to his employment on April 22, 2013, Plaintiff has been subject to continued harassment and retaliation.

42.     On May 10, 2013 Plaintiff was informed that the Department will divert a portion of the funds awarded to Plaintiff by the Arbitrator into the Pension Fund. This is not a standard Department practice, has apparently not occurred before, and was intended as an act of retaliation against the Plaintiff for engaging in First Amendment protected acts such as making statements to the press, being a member of the FOP, and filing grievances.

43.     On May 13, 2013 Sergeant Kuhlmeier, Plaintiff's superior, informed Plaintiff that he was not qualified for overtime pay because he was "still in administrative capacity." Other Detectives inside the Homicide Unit have earned overtime when they were working in an administrative capacity, including when they were working in an administrative capacity as a result of a Protection from Abuse Order.

44.     On May 16, 2013, approximately four weeks after Plaintiff returned to his employment, Plaintiff was forced to file grievances because he had not yet received his badge and gun.

10

45.     On May 21, 2013, nearly one month after his scheduled return, and after filing a grievance, Plaintiff was finally able to return to active duty on the Special Investigations Unit.

46.     On May 24, 2013 Captain Clark, Plaintiff's superior, reassigned Plaintiff, without warning, to #3 Platoon effective Monday, June 3, 2013. Pursuant to the Collective Bargaining Agreement, Plaintiff is entitled to notice thirty (30) days before being transferred, and thus this transfer was improper.

47.     Plaintiff, like most Homicide Detectives, derives a substantial portion of his income from testifying in court proceedings related to his investigations. As a direct result of the false accusations, Plaintiff is now potentially subject to impeachment of his credibility as a trial witness and thus prosecutors will not call him to testify. As a result of the stigma to his reputation, Plaintiff will no longer be called as a witness in court and will lose a substantial portion of his income as he will no longer be able earn "court overtime" pay.

48.     Indeed, back in August 13, 2012, Defendant Ramsey acknowledged the damage inflicted to Plaintiff's reputation and continued ability to testify in court in a statement Defendant Ramsey gave to Dana DiFilippo of Philly News. Defendant Ramsey admitted that criminal defense attorneys "will raise Rossiter's troubles in defense of an accused criminal" because "Defense attorneys do what they can to get their client off the hook." This harm was intentional and is permanent, and will persist even if Plaintiff leaves the Department entirely, and it will follow him as an officer elsewhere and as a private investigator.

49.     Due to Defendant Ramsey's pretextual termination, and despite the arbitration, Plaintiff has not been restored to the *status quo*. His reputation is tarnished,

11

his workplace is hostile to a perceived freeloader and afraid of collateral retaliation, his safety is compromised, and his earnings are diminished.

## COUNT I

### FEDERAL CIVIL RIGHTS VIOLATIONS – 42 U.S.C. §1983

### *Against The Individual Defendant*

50.     Plaintiff incorporates by reference all other allegations of the Complaint.

51.     Defendants terminated Plaintiff pre-textually as part of their bargaining with the FOP and to gain favorability with the press, without regard to the falsity of the allegations against Plaintiff or to Plaintiff's right to due process.

52.     Pursuant to 53 Pa.C.S.A. § 12638 and the Collective Bargaining Agreement, Defendants were required to provide Plaintiff with notice and an opportunity for a hearing prior to terminating his employment, and Plaintiff was entitled to a PBI hearing after formal charges were drafted and served upon the Plaintiff.[7]

53.     The actions of the Defendants were taken under color of state law.

54.     As a direct and proximate result of Defendant Ramsey's conduct, committed under color of state law, Plaintiff suffered denial of procedural due process; denial of substantive due process; denial of equal protection; denial of freedom from retaliation for exercising his First Amendment rights both as a member of a union and as an employee who filed a grievance; invasion of the liberty interest in his reputation; and failure to accord him the benefit of 53 Pa.C.S.A. §12638.

---

[7] According to 53 Pa.C.S.A. § 12638, "[n]o police officer or fireman, except those dismissed during probationary period, shall be removed or discharged, except for cause, upon written charges, and after an opportunity to be heard in his own defense."

55.    As a direct and proximate result of the acts of Defendant, Plaintiff has suffered emotional distress, embarrassment, emotional harm, humiliation, stigma to his reputation, damage to his earning capacity, loss of employment opportunities, loss of liberty, and other financial losses, all to his detriment and harm.

## COUNT II

## FEDERAL CIVIL RIGHTS VIOLATIONS – *MONELL*

### *Against The Municipal Defendant*

56.    Plaintiff incorporates by reference all other allegations of the Complaint.

57.    Between 2008 and 2010, Defendant Ramsey, acting under color of state law, issued approximately fifty-one (51) direct-action dismissals without following internal investigation procedures and without affording the dismissed officers their constitutional right of due process.  The majority of the aforementioned dismissed officers were later reinstated through arbitration proceedings that determined they had been fired without just cause.

58.    Defendant Ramsey has publicly criticized the procedure for dismissal set forth in the Collective Bargaining Agreement, stating: "The process here is just way too slow" and "I don't think arbitrators are neutral. I think the system is flawed." Consistent with those remarks, Defendant Ramsey has routinely ignored the process to which the City agreed, intentionally or with reckless disregard to the police officer's Constitutional rights.

59.    In reference to the firing of other officers by direct action and without due process, Defendant Ramsey said to the *Philadelphia Daily News*: "Sometimes you have to make a decision that's in the best interest of the City and the Department, and let the cards fall where they may." Letting the cards fall where they may is the antithesis of due

13

process; there is no need or justification for Defendant Ramsey to exhibit such callous indifference to the federally protected due process rights of police officers, such as the Plaintiff, and his continuing practice of utilizing terminations for pretextual, political, and union-bargaining reasons has both damaged the reputations and livelihoods of good police officers and has cost the City undue sums of money.

60.    On December 5, 2012, Defendant Ramsey gave an interview with the *Philadelphia Daily News* in which he attributed a reduced increase in homicides to, among other factors, "using overtime" and "deploying additional officers in those areas," thereby further revealing the arbitrary and capricious nature of these terminations. The pages of the local papers, too, are filled with reports of officers who went unpunished despite far more credible allegations of abusive, fraudulent, and illegal conduct.

61.    Defendants' practice and custom of terminating officers, including Plaintiff, by "Commissioner's Direct Action" instead of following the procedure set forth in the Collective Bargaining Agreement is a practice and custom of the Police Department that directly causes violations of federally protected rights.

62.    Defendants' knowingly, intentionally,  recklessly, and deliberately indifferent conduct was under the color of state law pursuant to an unconstitutional, custom,  policy, and practice and violated Plaintiff's constitutional, civil and other rights.

63.    Defendant City of Philadelphia has encouraged, tolerated, and/or ratified practices and customs in the Police Department that cause violations of constitutional rights.

64.    As a result of Defendants' knowingly, intentionally, recklessly, and deliberately indifferent concerted conduct under the color of state law pursuant to an unconstitutional, custom policy, and practice, Plaintiff suffered and continues to suffer

great pain and suffering, emotional distress, mental anguish, damage to his reputation and earning capacity, loss of employment opportunities, scorn of the community, economic loss and loss of his constitutional and other state and federal rights.

   **WHEREFORE**, Plaintiff requests the following relief:

   a.   Compensatory damages as to all Defendants;

   b.   Punitive damages as to the individual Defendant;

   c.   A declaratory judgment that the practices, policies and customs alleged in this Complaint are unconstitutional;

   d.   A preliminary and permanent injunction to prohibit the Defendants from engaging in the practices, policies and customs alleged in this Complaint;

   e.   Reasonable attorney's fees and costs as to all Defendants;

   f.   Further relief as may be appropriate.

### THE BEASLEY FIRM, LLC

By:   *Maxwell S. Kennerly /s/*

   JAMES E. BEASLEY, JR., M.D., ESQ.
   MAXWELL S. KENNERLY, ESQ.
   Attorneys for Plaintiff
   1125 Walnut Street
   Philadelphia, PA 19107